N. E. REDLON COMPANY *v.* FRANKLIN SQUARE CORPORATION.

*Conrad E. Snow* and *Frank E. Blackburn* (*Mr. Snow* orally), for the plaintiff.

*Laurence I. Duncan* and *Maurice E. Rosen* (of Maine), (by brief and orally), for the defendant.

PAGE, J.   I.  One of the purposes of the recommittal after the former opinion was to ascertain what, if any, allowance should be made to the defendant because of the substitution of damp-proofing for membrane waterproofing on the outside of the foundation walls.

At the last hearing it appeared that the plaintiff, before making its own bid to the defendant, received a bid for the waterproofing from the Western Waterproofing Company, which likewise made identical bids to other general contractors who were estimating on the defendant's building.  The Western's estimator testified as to the process of figuring and making these bids.  He stated that in the preparation of his bid (which later became the basis of the plaintiff's bid and the contract price) he examined the specifications and the plans.  He noted that neither provided for the application of membrane waterproofing under the footings and the basement floor, with a complete bonding, which he said is usual in that method of waterproofing.  Without such bonding, water at pressure would be likely to pass under the footings and into the cellar, even though it were kept from coming through the walls.  He further noted that the specifications called for "two coats" of "membrane waterproofing."  The phrase "coats" is used in connection with damp-proofing, but not in connection with membrane waterproofing.  In view of these facts he interpreted the plans and specifications as calling for damp-proofing, and he made his estimates and bids accordingly.

Two architects called by the defendant gave testimony consistent with the above.  One said that the words "two coats" made it "A matter of judgment there as to the interpretation of two coat or one coat membrane waterproofing."  The other agreed that the phrase required interpretation.

This line of evidence was excepted to on the ground that it varied the interpretation of the contract as settled by the former opinion. It was not offered or admitted for that purpose, but solely upon the question of damages.  If the contract price had included a charge for membrane waterproofing, justice might have required an allowance of the difference between the cost of membrane waterproofing and that of damp-proofing.  If no such overcharge were made, a credit would not be compelled.  The exceptions to the admission of this evidence and to the denial of the motion to strike it out are overruled.  The evidence warranted the finding that no allowance

was due, and the exceptions to the finding and to its allowance are also overruled.

The referee refused to hear evidence on the question of other (consequential) damages caused by the substitution, and the defendant excepted. The subject of such damages was thoroughly tried at the original hearing, and certain damages were then allowed. At the time of the former transfer the defendant did not raise any question as to these damages, but merely the point that damp-proofing was substituted at about one-ninth of the cost of membrane waterproofing. No claim was made prior to the last hearing that any new evidence had been discovered as to the issue of consequential damages.

Moreover, the referee has made a finding that the purpose of membrane waterproofing was to give the defendant a wall that would keep the water from going through, and that the purpose of the damp-proofing was the same. The exception to this finding is overruled. If it might be thought that one treatment would be more effective than the other, the referee took the view most favorable to the defendant, that the plaintiff was bound to furnish a wall through which water could not come. It was because such a wall was not furnished that the referee awarded the defendant consequential damages at the first hearing.

The defendant's requests for findings and rulings on this branch of the case have all been examined. All were irrelevant, or inconsistent with the views here expressed, or based upon selected evidence which might have been disbelieved.

II. With reference to the failure of the plaintiff to perform its contract to spread gravel making "at least a six inch bed under all [basement] floors," the former opinion ordered a recommittal, with a rehearing if necessary, to determine (1) whether the defendant knew of and consented to the deficiency and if not, (2) what would have been the cost to the plaintiff of preparing for, furnishing and spreading the deficiency that might be found. But it was ordered that no deduction from the contract price should be made (a) because the fill furnished does not properly drain the building, the contrary having been properly found, or (b) because of any deficiency in ledge excavation, since the defendant has been charged for only so much as was done. The fact of incidental damages having thus been negatived, the only issue was the amount of money saved by the plaintiff at the expense of the defendant (because of deficiency of earth excavation, gravel and spreading) without the consent or waiver of the defendant.

After further hearing on recommittal, the referee has made an allowance for the deficiency because "it was not proved that the defendant knew of or consented to the deficiency." The credit given was $115 for shortage of gravel, $15 for defendant's stone chips used, and $49.25 for deficiency of earth-excavation.

The defendant excepted to the findings and to their allowance on the ground that they are not supported by evidence. They clearly have such support, and the exceptions are overruled.

In connection with this branch of the case, certain of the defendant's requests were denied subject to exception. One of these requests was to the effect that no fill gravel was purchased from January 1 to May 1 (the floors were laid in February). That seems to be the fact, but if found "it would have settled nothing." *Roberts* v. *Company*, 78 N. H. 491, 493. Such a finding would not have excluded the probability that during the period named, and earlier, the plaintiff purchased enough gravel of this and a better grade to have done all the work required by the contract except for the shortage now found and credited to the defendant. The amount of that shortage, if added to actual purchases, would have been equivalent to the total estimated by one of the defendant's witnesses as sufficient for the full performance of the contract.

The other requests on this branch of the case all centered about the question of burden of proof. The objection that the plaintiff's evidence asserted that the fill was properly made, that the plaintiff must have known of the extent of the shortage, but offered no proof of it, is not well taken. If the hint was intended that the plaintiff was acting in bad faith, the record does not compel such a finding. It is a familiar principle that the burden of proof does not require the plaintiff to produce the evidence upon which the referee bases his findings; the referee may properly rely upon the defendant's evidence, and he did so in this instance.

Nor is it a determinative matter that the plaintiff did not produce the daily reports made by the plaintiff's employees of the use of gravel, though demanded nine years after the transactions. The active manager of the plaintiff died before the first trial, and the plaintiff had ceased to do business prior to the demand for production. There is no evidence that the daily reports were ever intended or used for any purpose other than as the basis for monthly entries on a memorandum cost-account which was produced, but which made no distinction between gravel used for cement and that used for fill. If that were their sole purpose, they were not designed for the keep-

ing of an account with the defendant, and the supposition of their intentional destruction would have no significance useful to the defendant.

The request that the disappearance of these slips "must receive great weight" did not compel an affirmative answer. There was no evidence to weight except that produced by the defendant. The weight of that evidence (of ocular examination of the material in the test-holes), upon which alone the referee based his findings, could not be affected by the absence of the slips or other evidence produced by the plaintiff.

All exceptions to the denial of requests on this branch of the case are overruled.

III. In the former opinion it was pointed out that the changes in the basement floors would entitle the defendant to a credit if the defendant did not consent, unless they were made by the architect as authorized by the contract and were minor, involving no extra cost and not inconsistent with the purpose of the building. Consequently the recommittal required findings on the issues of consent, authorized interpretation, minor change, and if necessary the allowance proper to be made. The Superior Court, in the order of recommittal, overlooked the primary issue—whether the architect made the change in the exercise of his authority to interpret the contract when there was an inconsistency (here existing) between the specifications and the plans. This issue, however, was not overlooked by the referee.

The specifications called for a five-inch floor in every section of the basement, but the plans called for four-inch floors in the wings—a three-inch slab with one inch of granolithic finish on top. The architect ordered the installation of solid four-inch floors with integral waterproofing, as was found at the former hearing. As compared with the specifications, there were two changes ordered: (a) as to total thickness, (b) as to the method of laying and waterproofing the floors.

As to the thickness, the referee has now found that in ordering the change the architect "was acting under his authority [by terms of the contract] to follow the plan rather than the specifications when the two did not agree." Consequently no credit was given because the wing-floors were laid only four inches thick. There was evidence in the original record to support the finding. The exceptions to the finding and the allowance of the report in this respect are overruled. Requests for findings on this particular issue were substantially granted; at least the findings are not inconsistent with them.

The next issue recommitted was whether the architect made more than a minor change in substituting a single four-inch slab with integral waterproofing for three inches of slab painted with waterproofing and overlaid with one inch of granolithic top. Under the terms of the contract, the architect had such authority if no extra cost were involved and the change was not inconsistent with the purpose of the building.

It has now been found that the change was a minor one in these senses. The architect testified that the difference in expense was slight, consisting principally in the labor of brushing on the waterproofing before laying the top inch. He further testified that when they came to the laying of the floors they discovered some water which in his judgment might exert enough pressure to cause a separation of the two layers, so that the defendant would get a better job if the floors were laid in one slab, relying on integral waterproofing mixed with the cement to keep the water out. The referee adopted this evidence and found that the defendant got a floor "as good or better than the specification called for." The exceptions to the findings mentioned in this paragraph and to the allowance of the report as far as they are concerned are overruled. Requests for findings inconsistent with the foregoing were properly denied. Requests for rulings of law were inconsistent with the former opinion in this case.

The substitution contemplated the use of integral waterproofing. Its use was found by the referee after the first hearing. The floors were laid by a sub-contractor named Devine, who furnished only labor, the plaintiff supplying all materials he used. While Devine did not testify, the plaintiff's superintendent testified at the first hearing that Devine used waterproofing, that the waterproofing used was chloride flakes, which Devine thought was good waterproofing. At the last hearing, the same witness testified that he had meantime learned that calcium chloride is not waterproofing and that Devine, to his knowledge, used no other ingredient. On the theory that the superintendent's testimony was thus reduced to neuter, the defendant insists that there is no evidence that integral waterproofing was used.

The referee has now found that Western integral was used. The evidence on which he relies is that the Western Waterproofing Company furnished integral waterproofing for all concrete work of both the walls and floors of the basement at the cost of $330; that this item appears on the plaintiff's invoice book and is charged to the job.

This is supported by documentary evidence. The referee further relies on the testimony of the architect of his own knowledge that the integral waterproofing was on the job and disappeared. The architect also said that there was a discussion about the matter between him and Mr. Redlon and Mr. Devine and that it was understood between them that the integral was to be used. This evidence was sufficient to make it appear more probable than otherwise that the integral was used. The fact that neither the superintendent nor the architect saw it used, though no evidence of its use, was equally no evidence that it was not used. There was an undertanding that it was to be used, it was upon the premises, and it was not there afterwards. The referee was not bound to believe that the waterproofing was meanwhile dishonestly removed by the plaintiff, and he distinctly refused so to believe. Nor was he under obligation to suppose that somebody else stole it from the premises. Under the circumstances, he was at liberty logically to make the deduction that he did.

The defendant relies upon the testimony of Mr. Clair at the first trial that he analyzed two specimens of concrete from the floors; that he found no evidence of waterproofing material; that he did find evidence of calcium chloride; that this substance was often sold as waterproofing, but in his opinion had no value as such. Like other evidence relied on by the defendant, this testimony was to be weighed with other and conflicting evidence. It was not controlling, however persuasive to the defendant. The exceptions to the finding that waterproofing was used and to the acceptance of the report in this regard are overruled.

The defendant relies on some twenty-seven requests on this narrow branch of the case. We have considered them fully. As far as they were not granted in substance, they were based upon misinterpretation of the contract, were immaterial, were logically faulty, or depended for acceptance upon the way the trier of fact viewed the evidence or upon the credit and weight given to various witnesses. The exceptions to their denial are overruled.

At the original hearing, the defendant elicited, at three different times, certain testimony upon cross-examination of the architect. Six years later, at the end of the last hearing, the defendant for the first time objected to this testimony and moved that it be stricken from the record, on the ground that the statements were not of the architect's own knowledge. The motion was denied, and the defendant excepted. The exception is overruled. The extent of the

knowledge of the witness clearly appeared at the time he testified. If there was surprise or prejudice, it was immediately apparent. It would seem there was neither. Such an objection as was made *"must be made as soon as the applicability of it is known."* 1 Wigmore, Evidence, (2d. *ed.*), *s.* 18 *a.* The rule is designed to shorten litigation and to guard against exhaustion of the parties and the court. It should not be relaxed in this instance.

IV. After the last findings were made, and while the case was being prepared for the present transfer, the defendant moved in the Superior Court that the issue concerning the floor be resubmitted for a new trial on the ground of newly discovered evidence. The Superior Court granted the motion and the question is brought here upon the plaintiff's exceptions to the Superior Court's findings and rulings and to the granting of the motion.

In support of the motion the defendant offered three affidavits. The first is that of Mr. Rosen, treasurer of the defendant, apparently always the leading spirit of the defendant and now of counsel. This affidavit alleges that Mr. Devine, who laid the floors, was present for two or three days of the first stage of the trial in 1933; that at the close of that stage, counsel for the plaintiff stated that Mr. Devine had been present and ready to testify, but had been called away to a job and was not available; that subsequently other hearings were had before the referee (prior to the first findings and transfer), and he was not produced; that Mr. Rosen sometime in 1933 or 1934 (apparently after the first hearing and prior to the first transfer) asked Devine for information, but Devine refused to make a statement; that on the last day of the last hearing prior to the present transfer, the plaintiff produced at the defendant's demand certain correspondence between Devine and the plaintiff; that this correspondence negatived the testimony of the architect that the change in the floor was the result of a conference between the architect, Redlon and Devine, for two reasons, (a) the integral waterproofing had been ordered by the plaintiff before any such conference could have been held, and (b) Devine was at the time of the correspondence in Connecticut and did not come to Dover or to Maine until after January 1, 1930; that as soon as possible Mr. Rosen called upon Mr. Devine at his home in Maine, showed him copies of the correspondence and requested a statement, which Mr. Devine at first refused; that finally Mr. Devine said that he never saw the architect until after he came to Dover about February 1, 1930; that Mr. Devine subsequently gave the affidavit presently to be outlined.

The affidavit of Mr. Rosen is based upon an incorrect statement of the facts. If they had been correctly stated, it is fair to suppose that the Superior Court would not have ordered the new trial. Mr. Rosen's first claim is that the correspondence between the plaintiff and Mr. Devine shows that the architect's interpretation of the contract had been made before Mr. Devine came home from Connecticut, and not, as the architect said, after conference with Mr. Redlon and Mr. Devine. The correspondence in fact supports the exact contrary of Mr. Rosen's claim. It is perfectly clear that at no time during the period of the correspondence had the plaintiff been under instructions to build single-slab four-inch floors in the wings in place of the floors described in the specifications.

The correspondence makes it certain that as late as January 25, no change to single-slab floors was contemplated. On that date, Devine, if not back from Connecticut, was about to come back. Yet for some reason Mr. Rosen claimed that the change had been made while Mr. Devine was in Connecticut and made it a ground for seeking a new trial. Whether or not he intended it, he was making statements apt to mislead the court. The fact that integral waterproofing was ordered for the floors in September, although the plantiff planned as late as January 25, 1930, to lay the floors with granolithic, does not indicate as alleged a plan in September to lay the floors in one slab alone, but does indicate an understanding on the plaintiff's part that integral waterproofing was to be used in the slab even if there were a granolithic top.

Mr. Devine states in his affadavit that prior to making his bid, he never saw the plans or specifications (which in no way contradicts anything ever testified or found), and that he never talked with architect, owner or contractor before making the bid (which contradicts nobody and is immaterial). He further states that the correspondence developed the facts on which he based his bid (which is self-evident); that he was asked for a price on a four-inch floor, three inches of slab and one of granolithic, and that his bid would have been considerably more for a five-inch floor (though he may have misunderstood the meaning of the plaintiff's phrase "4″ thick, with 1″ granolithic"). This affidavit, like Mr. Rosen's, has no least persuasive effect as to the time and place, or actual happening, of the conference preceding the ordering of the changes. It is significant in the extreme that Mr. Devine was not induced to deny that the floors were discussed after he got to Dover; on the contrary the appearance is of the assumption contrary to fact that the change was

made while Mr. Devine was in Connecticut, a denial by Mr. Devine that he ever talked the matter over with anybody before he made his bid, and the consequent submission to the court of a misleading issue as background and make-weight for the motion.

Mr. Devine's affidavit avers that he used calcium chloride for cold-weather hardening; that he used no integral waterproofing, and there was none on the premises; that one of his helpers was Cecil E. Cromwell, and he does not know the name of the other helpers loaned by the plaintiff. Cecil E. Cromwell makes an affidavit similar to Mr. Devine's with respect to calcium chloride and water-proofing.

Mr. Rosen's position with the defendant is such that his knowledge may be regarded as the knowledge of the defendant. His and their knowledge and their state of mind are shown by his affidavit. After reciting the failure of the plaintiff to put Mr. Devine on the stand at the first of the several hearings in 1933, he says: "That subsequently hearings were had before the Referee, but notwithstanding the fact that the plaintiff apparently had ample opportunity to place Devine on the stand, they had not done so. The defendant believed that it was because the actual facts, as known by said Devine, would not support the plaintiff's claim." This belief existed, according to the statement of Mr. Rosen, at least as early as the close of the last hearing in 1933.

Action on this belief was limited, according to the affidavit, to an attempt in 1933 or 1934 to get Mr. Devine to talk. Mr. Devine is said to have refused. A refusal would normally have tended to confirm the belief already formed. The defendant having the belief declared, nothing more was done. The defendant made no motion for a continuance at the close of the hearing in order to procure the testimony of Devine, whether by summons or deposition. After the first interview with Devine, no reopening of the case was requested prior to the first transfer. After the former opinion and prior to the rehearing, no attempt was made to get the testimony long believed to be locked up in Mr. Devine's keeping.

There was nothing in the correspondence introduced at the close of the last hearing which was calculated to give Mr. Rosen or the defendant any knowledge regarding Mr. Devine's value as a witness which they had not possessed for years. The failure of the plaintiff to place Mr. Devine on the stand in 1933 did not relieve the defendant, holding the belief of Devine's essential knowledge, from the exercise of due diligence to have the case continued or reopened in

1933 so as to obtain Mr. Devine's testimony. *Ingalls* v. *Railroad,* 83 N. H. 397, 398. It could not be found that the defendant has exercised diligence in this respect. It must be found that the defendant, with full belief in the importance of Mr. Devine's testimony, chose to chance the issues of the referee's various findings without it. This is not accident, mistake or misfortune of the sort contemplated by P. L., c. 342, s. 1. The plaintiff's exception to this order is sustained.

Up to this point the referee's reports are entitled to final affirmance.

V. In the former opinion we sustained the finding made at the first hearing that the defendant consented to the substitution of Douglas fir timbers for Southern pine. Just prior to the rehearing the defendant moved for a new trial of this issue. The motion was granted subject to the plaintiff's exception, and the issues recommitted pursuant to our former opinion were ordered heard, pending transfer of this exception.

The reason assigned for the substitution was a shortage in the Southern pine market which would have necessitated a special order to mills in the south, with a delay of five or six weeks in delivery and consequent setting back of the construction. The contract was signed on August 31, 1929. The authority for substitution was given to the plaintiff by the architect on the morning of September 12, 1929, or before, if we are to believe a letter offered by the plaintiff and excluded upon the defendant's objection.

After the motion for a new trial had been granted, the defendant moved to amend its motion by alleging, and offering supporting affidavits, that on September 11 and 12, 1929, Mr. Rosen was in Washington. The supposed materiality of these affidavits depended on the allegation in the motion to amend "That the said findings of the referee are in turn based wholly upon the controverted testimony of the witness Rhodes [the architect] that the defendant's consent to the substitution was given by its Treasurer, Rosen, at a conference held in Portland on September 12, 1929."

The architect did not testify that the consent was given on the date named. The allegation that he did is the only color for finding Mr. Rosen's whereabouts on that day material in any respect.

The letter of September 12, relied upon by the defendant, does not exclude the probability that before he went to Washington Mr. Rosen gave his consent, as a result of which the formal direction for the change was made by the architect during his absence. Mr. Rosen once more merely laid before the court an assumption of the

evidence contrary to apparent fact, controverted the false assumption by affidavits, and obtained an improvident order to reopen the case to hear evidence that cannot contradict findings consistent with both the letter and Mr. Rosen's absence on September 11 and 12.

Five questions propounded by the court to the referee in connection with these affidavits need not be answered. Four of them relate to the immaterial absence of Mr. Rosen from Portland on September 12. The other relates to Mr. Rosen's knowledge of the difference between the price of Southern pine and that of fir, a matter discussed in the former opinion and immaterial in the view there expressed. If Mr. Rosen consented without inquiry as to price-difference, there could be no allowance; if he gave no consent because he was not asked to give it, his ignorance of price-difference would be equally immaterial, and allowance in order. Answer to the question would serve no useful purpose.

The main motion for a new trial of the issue of consent is supported by six affidavits. James B. Crozier, the plaintiff's superintendent, states that when the fir was delivered he called it to Mr. Redlon's attention as a mistake; that Mr. Redlon said that he had agreed with the architect for a substitution, which would benefit the defendant, as there would be a credit for the difference in cost of material and labor. Mr. Crozier testified twice at the original hearing. He was available for questioning regarding the substitution. The defendant did not take the opportunity to seek his knowledge.

George M. Wiggin makes affidavit that he is in charge of the Dover lumber yard where the plaintiff bought the fir; that the plaintiff never ordered long leaf hard pine; that the affiant could have furnished it as easily as he furnished fir; that there was no shortage in the market. Mr. Wiggin was called by the defendant to testify as to the market price of Southern pine. This was at the very end of the first trial. The defendant did not ask him any questions regarding the market conditions as to which the plaintiff had long before produced evidence.

There are affidavits of two other lumber dealers, one from Portland and one from Boston, to the effect that there was no shortage in 1929 and that they could have made prompt delivery of an order for Southern pine in September or October of that year. They also state the prices current in 1929. These affiants, or others who might give testimony of similar trend, were doubtless available if the defendant had sought them in 1933, but no effort appears to have been made to produce them.

The reason alleged for this failure to meet the legal and factual issues raised by the plaintiff's evidence is stated in two affidavits of counsel for the defendant during the first trial. He says that he then believed that the defendant was entitled to credit for the substitution as a matter of law; that he so advised the defendant during the trial, also that the fact of the scarcity, if it existed, was immaterial in his view of the law. This opinion proved later to be inconsistent with that expressed in 89 N. H. 137.

The view thus held by counsel is understood to involve the mistaken belief that the allowance was to be made as a matter of law even if in fact the defendant consented to the change. The finding of the trial court that justice requires a new trial of the issue of consent implies the subsidiary finding that the failure to adduce available evidence in 1933 was due to the mistake of law rather than to lack of diligence, because the shortage would be an immaterial fact if the belief of counsel as to the law was sound. Counsel generously takes to himself the blame for the situation, even though Mr. Rosen, whom he advised, was not without qualifications to determine the applicable law and to decide what due diligence required in view of the legal and factual claims so clearly made by the plaintiff. The question of diligence raised by the motion might properly have been found in favor of the plaintiff, but we hesitate to say that the findings made should be reversed as a matter of law. *Watkins* v. *Railroad*, 81 N. H. 363.

The Superior Court ordered the referee to answer fifteen questions at the rehearing which has been granted. Most of these questions have no apparent relation to the issue of consent. Some of them relate to matters which in the light of our former opinion seem perfectly irrelevant to this or any other issue. One relates to a collateral issue (whether "yellow pine" is Southern long leafed pine) on which a finding (supported by evidence) has already been made, though no newly discovered evidence has been suggested as to this issue. One relates to the question of minor change, which could become material only if the finding should be made that the defendant did not consent to the substitution.

To bind the referee to the determination of issues that may never become relevant is beyond the exercise of a sound discretion by the trial court. If, during the course of the rehearing, any issue becomes relevant to or dependent on the issue of consent, it may be gone into unless the court, by a proper order based upon the fact of prior adjudication, limits the issues to be tried. Thus, if the referee should

find there was no consent, a finding whether there was a minor change would necessarily be in order without any expressed direction by the Superior Court. If, however, that issue had already been determined without error of law, it might be excluded from consideration by order of the court. Further, if the issues of consent and minor change were both determined in favor of the defendant, the referee would make a finding as to damages as a matter of course, without any special order of the court. Whether, in the absence of any newly discovered non-cumulative evidence as to damages (and none yet appears), the issues as to damages shall, if reached, be reheard, though they have already been fully heard, may in effect be determined by the Superior Court. *West* v. *Railroad*, 81 N. H. 522, 533. Issues may be limited in proper cases, or left indefinitely open, but the court cannot obligate the referee to make findings that may turn out to be entirely irrelevant, thus expanding the issues beyond need and reason.

As to an allowance because the plaintiff enriched itself at the defendant's expense, the newly discovered evidence is purely cumulative. On the basis of evidence given at the first hearing, the referee found the factors of the actual cost of the timbers used, the price bid on yellow pine before the contract was signed, the September market-price of long leafed pine. Both parties understood that these factors were in issue during the original trial, they were fully gone into, and the findings were sustained in 89 N. H. 137, 140. It will be for the Superior Court to determine whether there shall be a limitation of those issues at the rehearing.

The issue of collateral damages to the building because of the substitution was decided adversely to the defendant at the first hearing. 89 N. H. 137, 140. No new evidence being offered on this score, the Superior Court may in discretion direct this issue not to be retried.

In any event, the order for the new trial should be modified in so far as it imposes upon the referee a duty to answer specific questions which may never come into issue.

VI. The defendant made nearly a hundred requests for findings and rulings. Forty-five of them have been transferred to us. There were many duplications, much experimenting with variant verbiage having no difference in meaning, requests totally immaterial, requests inconsistent with the former opinion. Some were based on selected evidence that might have been disbelieved. Others begged the question. Counsel should not, under cover of statute and a

general order of the Superior Court that all requests be answered, lay such an imposing burden on either the referee or this court.

*Case discharged.*

All concurred.